[NOTE.   For other cases involving this patent, see note to Decker v. Grote, Case No. 3,726.]

DECKER (RUE v.).   See Case No. 12,112.

DECKER v. SILVERBRANDT.   See Cases Nos. 3,724 and 3,725.

DECKER (WISE v.).   See Cases Nos. 17,906 and 17,907.

## Case No. 3,728.
### In re DECKERT.

[2 Hughes, 183; 10 N. B. R. 1; 3 Am. Law Rec. 96; 1 Cent. Law J. 316, 320; 6 Chi. Leg. News, 310; 1 Am. Law T. Rep. (N. S.) 336; 13 Am. Law Reg. (N. S.) 624; 8 Am. Law Rev. 786.] [1]

Circuit Court, E. D. Virginia. 1874.

BANKRUPTCY—STATE EXEMPTION LAWS — CONSTITUTIONAL LAW—AMENDMENTS—RECONSTRUCTION ACTS.

1. The provisions of the bankruptcy act [of 1867 (14 Stat. 517)], adopting the exemption laws of the several states has been sustained on the ground that it enacted a uniform rule that

¹ [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 1 Cent. Law J. 316, 320, and 8 Am. Law Rev. 786, contain only partial reports.]

such property should be subject to its operation for the payment of debts as was liable to judicial process for the same purpose in the several states. The amendatory act of March 3, 1873 [17 Stat. 577], so far as it departs from this rule and attempts to exempt property specified in the state laws, in a different manner or with different effect from that of the laws themselves, is a violation of the constitutional requirement of uniformity and therefore void.

[Disapproved in Re Jordan, Case No. 7,515; Darling v. Berry, 13 Fed. 668. Cited in McFarland v. Goodman, Case No. 8,789. Followed in Re Duerson, Id. 4,117; Re Shipman, Id. 12,791. Distinguished in Re Martin, Id. 9,152. Criticised in Re Smith, Id. 12,996.]

2. Congress, under the reconstruction acts, approved the constitution of Virginia on April 10th, 1869 [16 Stat. 40], and ordered it to be submitted to the people. On July 6th, 1869, it was submitted and adopted by a large majority of the people, who on the same day elected a governor, legislature, and other state officers. The governor was inaugurated in September, 1869, and the legislature met in October, 1869, and passed acts ratifying the 14th and 15th amendments—all of these preliminaries being required by the reconstruction acts before the admission of the state to representation in congress. Congress, on January 26th, 1870 [16 Stat. 62], passed an act admitting the state to representation. The constitution contained a provision for homestead exemption, but this was not applicable to debts incurred prior to the time the constitution went into effect. *Held*, that as to this clause the constitution went into effect on the day of its ratification by the people, July 6th, 1869.

[In bankruptcy. Daniel] Deckert was adjudged a bankrupt on his own petition on the 31st of March, 1873. An assignee was appointed May 16th, 1873, to whom his real and personal property was assigned in due form. So much of the personal property as was exempt under the bankrupt law was duly set off by the assignee. Its value was estimated at $337.75. The bankrupt, however, claimed a homestead exemption in the real property under the provisions of the constitution and laws of Virginia and the act of March 3d, 1873, amendatory of the bankrupt law; and on his petition the district court of the western district of Virginia ordered such homestead to be set off to him.

Certain judgment and other creditors now filed this petition for a review of that order.

[1. Henry Smith. On the 24th of January, 1868, the bankrupt and J. L. Deckert executed to one Robert Wason, at Chambersburgh, Penn., a note for the payment of $2,500 in one year after date, with interest. This note was afterwards assigned to Smith, who obtained a judgment upon it in the Washington county circuit court of Maryland, at the August term, 1871, for $1,441.80, that being the balance then due. At the April term, A. D. 1872, of the circuit court of Halifax, Virginia, another judgment was obtained by Smith against the bankrupt upon the Maryland judgment. This last judgment was duly docketed in Halifax, and became a lien upon the real estate assigned under the proceedings in bankruptcy. Smith, having been cited to show cause why the prayer of the

petition of the bankrupt for the assignment of the homestead should not be granted, appeared and submitted an abstract of his Virginia judgment, but he did not furnish the complete record, and did not submit the record of the Maryland judgment, upon which that in Virginia was rendered. This judgment remains unpaid.

[2. D. K. Wanderlink. On the 1st day of April, 1868, the bankrupt, as surety, executed a note with one J. L. Deckert, as principal, for the payment to Wanderlink of $651.50 in six months after date. Proof of this note was made against the bankrupt's estate April 28, 1873.

[3. E. A. Roberts, John A. Roberts, and Robert R. Roberts, partners under the name of Roberts & Co. On the 15th of November, 1869, one Gaines entered into a contract in writing with the bankrupt to construct for him (the bankrupt) a dyke upon his lands. For this he was, to be paid at the rate of ten cents per yard, a portion being payable as the work progressed, and the balance in ninety days after its completion. It does not appear at what time work under this contract was commenced, but it was completed on the 23rd of September, 1870, when there was a balance remaining unpaid of $500.25. This was assigned by Gaines to Roberts & Co., and they proved it against the estate on the 23rd of April, 1873. The cost of the whole work was $1,944.83. This has been reduced by payments so that only the above balance remained unpaid at the time of the bankruptcy.

[4. George Schindel. The bankrupt was, on the first day of April, 1870, indebted to him in the sum of $175 for rent of a house for one year from April 1st, 1869. He and the bankrupt, on the 30th of June, 1868, executed their joint note to Sarah Lee for $100, payable, with interest, in six months after date thereof. Schindel paid the whole of this note. In 1872 he commenced his action against the bankrupt in the circuit court of Washington county, Maryland, to recover the amount due him for the rent and one-half the amount paid on the note, and on the 25th of March, 1873, judgment was rendered in his favor for $270.52 and costs—$8.30. On the 22nd April, 1873, this judgment was also duly proved as debt against the estate.][2]

By article 11 of the constitution of Virginia, adopted in 1869, it was provided that every householder or head of a family should be entitled, in addition to the articles then exempt from levy or distress for rent, to hold exempt from levy and sale under execution, etc., issued on any demand for any debt theretofore or thereafter contracted, his real and personal property, etc., to the value of $2000, to be selected by him. An act of the general assembly of Virginia, approved June 27th, 1870 [Acts Va. 1869–70, p. 198], gave effect to this provision by prescribing

in what manner and upon what conditions such householder could set apart and hold such exemption.

Before WAITE, Circuit Justice, and BOND, Circuit Judge.

WAITE, Circuit Justice (after stating the claims of the petitioning creditors). Under the bankrupt law, as originally enacted, there was exempted from the assignment of property required to be made by the bankrupt to his assignee, among other, such property as was exempt from levy and sale under execution by the laws of the state in which the bankrupt had his domicil at the time of the commencement of the proceedings in bankruptcy, to an amount not exceeding that allowed by such state exemption laws in force in the year 1864. By an amendatory act, passed on the 8th June, 1872 [17 Stat. 334], this provision was changed so as to give the bankrupt the benefit of exemptions under the laws in force in 1871. In 1872 the court of appeals of Virginia unanimously decided (22 Grat. 266) that the provision of the constitution above referred to, and the statute giving effect to the same, so far as they applied to contracts entered into, or debts contracted before their adoption, were in violation of the constitution of the United States, and therefore void. After this decision, on the 3d March, 1873, congress passed another act in the following words: "Be it enacted, etc., that it was the true intent and meaning of an act approved June 8th, 1872, entitled, etc., that the exemptions allowed the bankrupt by the said amendatory act should and it is hereby enacted that they shall be the amount allowed by the constitution and laws of each state respectively as existing in the year 1871; and that such exemptions be valid against debts contracted before the adoption and passage of such state constitution and laws, as well as those contracted after the same, and against liens by the judgment or decree of any state court, any decision of any such court rendered since the adoption and passage of such constitution and laws to the contrary notwithstanding."

The first question which presents itself for our consideration is whether the act of 1873, in so far as it seeks, in the administration of the bankrupt law, to give an effect to the exemption laws of a state different from that which is given by the state itself, is constitutional. Congress has power to "establish uniform laws on the subject of bankruptcies throughout the United States." Const. art. 1, § 8. A bankrupt law, therefore, to be constitutional, must be uniform. Whatever rules it prescribes for one it must for all. It must be uniform in its operations, not only within a state, but within and among all the states. If it provides that property exempt from execution shall be exempt from assignment in one state, it must in all. If it specially sets apart for the use of the bankrupt certain property, or certain amounts of property in

one state, without regard to exemption laws, it must do the same in all. If it provides that certain kinds of property shall not be assets under the law in one place, it must make the same provision for every other place within which it is to have effect. The power to except from the operation of the law property liable to execution under the exemption laws of the several states, as they were actually enforced, was at one time questioned, upon the ground that it was a violation of the constitutional requirement of uniformity, but it has thus far been sustained, for the reason that it was made a rule of the law, to subject to the payment of debts under its operation only such property as could by judicial process be made available for the same purpose. This is not unjust, as every debt is contracted with reference to the rights of the parties thereto under existing exemption laws, and no creditor can reasonably complain if he gets his full share of all that the law, for the time being, places at the disposal of creditors. One of the effects of a bankrupt law is that of a general execution issued in favor of all the creditors of the bankrupt, reaching all his property subject to levy, and applying it to the payment of all his debts according to their respective priorities. It is quite proper, therefore, to confine its operation to such property as other legal process could reach. A rule which operates to this effect throughout the United States is uniform within the meaning of that term, as used in the constitution. The act of 1873 goes further, and excepts from the operation of the assignment not only such property as was actually exempted by virtue of the exemption laws, but more. It does not provide that the exemption laws as they exist shall be operative and have effect under the bankrupt law, but that in each state the property specified in such laws, whether actually exempted by virtue thereof or not, shall be excepted. It in effect declares by its own enactment, without regard to the laws of the states, that there shall be one amount or description of exemption in Virginia and another in Pennsylvania. In this we think it is unconstitutional, and therefore void. It changes existing rights between the debtor and creditor. Such changes, to be warranted by the constitution, must be uniform in their operation. This is not. The consequence is that the act of 1872 remains unchanged, notwithstanding its attempted amendment in 1873. The act of 1872 gives effect to the exemption laws of Virginia as they existed in 1871. The particular law under which the bankrupt in this case claims his exemption was passed in 1870; it does not apply to contracts made or debts incurred previous to the time the new constitution went into effect. That certainly was not before July 6th, 1869, and the debts due to Smith, Wanderlink, and Schindel were all incurred previous to that date. That of Smith dates from the time the note was given upon which his judgment was rendered, that of

Schindel from the making of the contract out of which the indebtedness arose, and that of Wanderlink from the time of the execution of the note which he holds. As against these creditors the bankrupt is not entitled to the benefit of the exemption.

The claim of Roberts & Co. requires us to determine at what time the constitution, as far as it relates to the provision in question, took effect. It is claimed by the bankrupt that this was on the 6th July, 1869, when the constitution was ratified by the people, and by the creditors that it was postponed until the 26th of January, 1870, when the act was approved admitting the state to representation in congress. The contract upon which Roberts & Co. base their claim was made on the 15th of November, 1869. This constitution was adopted in accordance with the provisions of the reconstruction acts of congress. These acts provided in substance that when the people of the rebel states should have formed a constitution in conformity with the constitution of the United States, and should have done certain other things named, such state should be entitled to representation in congress. It was also further provided that until the people of any of such states should be by law admitted to representation in congress, any civil government which might exist therein should be deemed provisional only, and in all respects subject to the paramount authority of the United States, at any time to abolish, modify, control, or supersede the same. In pursuance of these acts, a convention duly elected assembled in Richmond, on the 3d of December, 1867, and proceeded forthwith to frame a constitution, which was certified to congress as required by law, and thereupon an act was passed by congress and approved on the 10th of April, 1869, authorizing its submission to a vote of the people, and an election of the state officers provided for and of members of congress. The same act provided that if the constitution should be ratified at such election, the legislature of the state then elected should assemble at the capital of the state on the fourth Tuesday after the promulgation of the ratification, and that before the state should be admitted to representation in congress, the legislature that might thereafter be lawfully organized should ratify the fifteenth amendment proposed by congress to the constitution of the United States, and all the proceedings under the act should be approved by congress. Under the provision of these several acts the president of the United States issued his proclamation, designating the 6th July, 1869, as the time for submitting the constitution to the vote of the people. On that day the vote was taken, and resulted in an almost unanimous ratification. The state officers, members of congress, and members of the general assembly were elected at the same time. The governor, thus elected, was inaugurated on the 21st September, 1869. The general assembly met on the

5th of October, and on the 8th passed acts ratifying the fourteenth and fifteenth amendments. It then adjourned to reassemble after congress should approve this action of the people. On the 26th January, 1870, congress passed an act admitting the state to representation, and reciting that the people of Virginia had framed and adopted a constitution of state government which was republican. From this it will appear that the constitution was adopted and the government partially at least, organized under it previous to the 15th November, 1869. It is true that the constitution was adopted and the organization made to obtain admission to representation in congress, but it is equally true that it was framed and ratified by the people as and for a constitution of state government. Admission might follow its adoption, but was not necessary to give it effect. On the contrary, congress required that it should become operative and have effect before the admission could be granted.

In the act of April 10th, 1869, it was provided that at the time the vote upon the ratification was taken there should be an election by the voters of members of the general assembly and all the officers of state provided for by the constitution; that if the constitution should be ratified the legislature should assemble at the capitol on a day named, and that, when lawfully organized, it should act upon the ratification of the proposed amendments. There certainly could be no lawful action by a legislature under the constitution unless the constitution was in force at the time the action was had. That congress understood that the constitution was in force and operative at the time of the admission is apparent from the terms of the act granting such admission. In that it was recited that the people of Virginia had framed and adopted a constitution of state government which was republican; that the legislature elected under the constitution had ratified the fourteenth and fifteenth amendments, the performance of which acts in good faith was a condition precedent to the representation of the state in congress, and because this had been done such representation was permitted. It is true that the government was not fully organized in all its departments under the constitution, and that the United States retained its supervisory powers under the reconstruction acts, until the final action of congress. Complete organization of the government, however, was not necessary to give effect to the constitution, and no modification of the particular provision now under consideration was ever attempted by the United States. [The government established by the people remained as established until actually changed by the United States in the exercise of its supervisory powers.][3] In our opinion the constitution of Virginia took

effect, so far as it related to the provision for exemptions, on the 6th of July, 1869, the day of its ratification by the people. It follows that the exemption laws passed to give effect to that provision are to become operative for the benefit of its citizens from that date. As against Roberts & Co., therefore, the bankrupt is entitled to his homestead. The order of the district court [case unreported] allowing an assignment of the homestead as against the claims of Smith, Wanderlink, and Schindel, is reversed, but it is affirmed as against that of Roberts & Co.